UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER TRUMAN,

                              Plaintiff,

                    -v-

PETER BROWN,

                              Defendant.

19 Civ. 1546 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This case involves a plaintiff's attempt to enforce an agreement to keep silent about an extramarital affair in exchange for money. Plaintiff Jennifer Truman alleges that she and defendant Peter Brown engaged in a decades-long affair, during which Truman had a child, Samantha. Truman alleges that, years later, she told Samantha, now an adult, that Brown was her father, and that Truman and Brown then engaged in discussions about Brown reimbursing Truman for some of Samantha's expenses. Truman alleges that the two reached an agreement, under which Brown would give Truman money, and Truman would cease contact with Brown's family and not disclose her claim that Brown was Samantha's father. After Brown failed to pay the full amount demanded by Truman, Truman brought this action, in which she sues Brown for breach of contract, intentional infliction of emotional distress, and negligent infliction of emotional distress.

Brown now moves to dismiss. For the reasons that follow, the Court dismisses Truman's complaint, with prejudice.

## I.  Background

### A.  Factual Background[1]

#### 1.  Truman and Brown's Relationship

In 1985, Truman, then age 21, got a summer job working on Brown's yacht in Fort Lauderdale, Florida.  *See* Compl. ¶¶ 12, 16.  Truman owned a yacht-refinishing company and had, through that work, gained boating expertise.  *Id.* ¶ 15.  Brown was a prominent businessman who headed a sportswear-manufacturing company and was wealthy, as evidenced by his private jet, cars, and boats.  *Id.* ¶¶ 13–14.  After Brown, who was in his late 30s, stopped by the yacht and met Truman, he offered her a job as a full-time member of the yacht's crew.  *Id.* ¶¶ 12, 17–18.

Shortly thereafter, Truman and Brown began to build a close relationship, in which Truman confided in Brown about her childhood, including her family's limited resources, the abuse she suffered from her alcoholic mother, and her lack of a father figure.  *See id.* ¶¶ 19–20.  Truman also told Brown that she suffered from low self-esteem and that she was vulnerable to strong male influences.  *Id.* ¶¶ 20–21.  At some point, Brown attempted to turn the relationship

---

[1] This account is drawn from Truman's complaint, Dkt. 1 ("Compl."), and its attached exhibits, Dkts. 1-4–1-10.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  These exhibits include a September 17, 2018 letter from Truman to Brown, Dkt. 1-4 ("Sept. 17, 2018 Ltr."); a series of text messages between Truman and Brown, Dkt. 1-5 ("Text Chain"); a September 21, 2018 letter from Truman to Brown, Dkt. 1-6 ("Sept. 21, 2018 Ltr."); several transcripts of recorded phone calls between Truman and Brown, Dkt. 1-7 ("Call Trs."); an email chain between Truman and Brown, Dkt. 1-8 ("Email Chain"); a demand letter from Truman's counsel to Brown, Dkt. 1-9 ("Demand Ltr."); and Brown's counsel's response to Truman's demand letter, Dkt. 1-10 ("Demand Response").  For the purposes of resolving a motion to dismiss, the Court accepts all factual allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

into a sexual one. *Id.* ¶ 22. Truman resisted at first, but later gave in, beginning a sexual

relationship that would last for decades. *Id.* She believed Brown cared for her and that the

relationship would allow her to keep her job. *Id.* ¶ 23. Truman and Brown engaged in sexual

acts on the yacht, in hotels, and in Brown's car, sometimes when Brown's wife and family were

nearby. *Id.* ¶ 24.

During Truman and Brown's relationship, Truman dreamt of working in the fashion

industry. *Id.* ¶ 27. She turned down marriage proposals from another man, Jeff, to preserve her

opportunity to move to New York City to pursue that dream. *Id.* ¶ 26. Brown said that he would

help Truman, and gave her a job at Heather Hill Sportswear, a men's and boys' sportswear

company his family owned. *Id.* ¶¶ 13, 27–28. She prepared to move to New York and enrolled

in the Fashion Institute of Technology ("FIT"). *Id.* ¶ 29.

In late summer 1986, before Truman moved, she became ill. *Id.* ¶ 30. She decided to

move to New York anyway. *See id.* ¶ 32. Later, Truman discovered that she was pregnant. *See

id.* ¶¶ 31, 33–34. She was scared; she quit her job at Heather Hill, withdrew from FIT, agreed to

marry Jeff, and moved back to Florida. *See id.* ¶¶ 35–37. Brown knew about the pregnancy and

that he was the likely father. *See id.* ¶ 38.

In 1987, Truman gave birth to Samantha. *Id.* ¶ 39. In 1989, Truman and Jeff divorced,

and Jeff moved to California. *Id.* ¶ 40. Jeff did not provide assistance to Truman and Samantha,

although, after he died years later, Truman received some of his Social Security income.

*Id.* ¶¶ 40–41. Truman did not tell Samantha that Brown was her likely father. *See id.* ¶ 64.

After Jeff died, Brown asked Truman to come back and work on his yacht; Truman

accepted. *Id.* ¶ 42. Brown persuaded Truman to resume their sexual relationship; he would

often comment that he should help with Samantha, although he never did. *Id.* ¶¶ 43, 45. Truman worked on the yacht every summer, and was often around Brown and his family. *Id.* ¶ 44.

After Brown's son died, Brown and Truman spent much time together on the yacht, because Brown's son had loved the water. *Id.* ¶¶ 47–48. Brown's wife thanked Truman for taking Brown on boat rides, which she did not enjoy. *Id.* ¶ 48. Explaining the amount of time Truman and Brown were together, Brown told others that he "cared for [Truman] as a daughter" and that she was "part of his family." *Id.* Brown insisted that Truman help him maintain the lie that she was "like a daughter" to him. *Id.* ¶ 51. Truman felt that she was a member of Brown's family and was confused by the relationship. *Id.* ¶ 52. Brown led Truman to believe that if she needed anything, he would be there for her. *Id.* ¶ 50.

In 1992, Truman's grandmother died, and a part of her will required that Truman go back to school. *Id.* ¶ 54. Truman moved back to New York City and planned to attend FIT. *See id.* She also worked for Brown at Heather Hill, where she stayed until 1999. *Id.* ¶¶ 54–55.

In 2000, Truman worked on Brown's yacht in East Hampton and later found work with a shipping magazine. *Id.* ¶¶ 55–56. During this time, Brown and Truman continued their sexual relationship. *See id.* Brown told Truman that he "should be helping her" and that "one day [her] student loans [would] be gone." *Id.* ¶ 57.

In 2001, Truman applied to law school and was accepted for the class entering in fall 2002. *Id.* ¶ 58. Brown remained in contact with Truman, but despite his promises to help her, never did. *See id.* ¶¶ 58–59. Truman raised Samantha on her own, covering her expenses as a child, including while Truman was in college and law school. *See id.* ¶¶ 60–61. Truman missed out on various opportunities while raising Samantha as a single mother. *See id.* ¶ 61.

Truman and Brown's sexual relationship continued until sometime before Truman's birthday in 2016. *See id.* ¶ 90. During those years, Truman alleges, Brown took advantage of her weaknesses and insecurities to make her "his sexual possession" and "his sexual 'play thing.'" *Id.* ¶ 88. Brown alienated Truman from her own support system. *Id.* ¶ 89.

The day after Truman's birthday in 2016, after Truman had begun to see man named Ivan, Brown called Truman, joking that she needed to return some of his old jackets. *Id.* ¶ 90. This prompted Ivan to ask questions about Truman's relationship with Brown, including whether Brown was Samantha's father. *Id.*; *see also* Sept. 21, 2018 Ltr. at 1. In response, Truman lied to him. Sept. 21, 2018 Ltr. at 1.

At some point, Truman needed a loan and sought help from Brown. *See* Compl. ¶ 91. Brown put her into contact with a banker friend, but the banker refused to provide her a loan. *Id.* Truman returned to Brown for help. Brown responded, "if you cannot get the money anywhere else, you will have to pay me back with your body." *Id.* Truman declined. *Id.*

## 2. Truman and Brown's Agreement

On June 1, 2018, Samantha took a 23andMe DNA test. *Id.* ¶ 63. The results indicated she was related to a relative of Brown's. *Id.* On September 1, 2018, after Samantha had asked questions, Truman admitted to Samantha that Brown was likely her father. *Id.* ¶ 64.

On September 17, 2018, Truman sent Brown a letter, informing him that Samantha knew of his likely paternity. *Id.* ¶ 65; *see* Sept. 17, 2018 Ltr. Truman wrote: "Now that the truth is out—don't you think it is your turn to step and return the favor to me for all the pleasure/escape I gave you in life." Sept. 17, 2018 Ltr. at 1. She added: "You thought you could just use me as a sex toy, no one would find out and there would never be consequences." *Id.* She cited Brown's earlier statements that he would help pay for Truman's student loans and leave her something in

his will.  *Id.*  She asked Brown to "make it right with both Samantha and myself, now, not when you die."  *Id.*

The next day, Brown texted Truman, stating that he was not doing well, but was "eager to help where and how I can."  Compl. ¶ 66; Text Chain at 2.  After Brown asked what the balance of Truman's student loans was, Truman responded:  "If you want to put a price on it, think about how much it cost you to raise and educate [your daughter] Melissa, because Samantha is your daughter just like Melissa."  Text Chain at 2–4.  Brown responded that he would "deal with the tuition and therapies."  *Id.* at 4.

The sum Truman sought was far less than Brown had paid toward his other children, for whom he had paid for private schools, nice clothes, vacations, and higher education. Compl. ¶¶ 67–68.  Truman contrasts her motherhood with that of Brown's wife, who had "an easy time being a 'mother,'" with nannies and maids to help her.  *Id.* ¶ 68.  Truman was "enraged" that Brown had not provided similar support to her and Samantha.  *Id.* ¶ 71.  As result, she wrote Brown a second letter, dated September 21, 2018; Truman texted Brown a picture of that letter on September 20, 2018.  *Id.* ¶ 72; *see* Sept. 21, 2018 Ltr.; Text Chain at 5.  The letter complained that Truman's lies about her relationship with Brown had ruined her relationships with Ivan, the man she had been seeing, and with Samantha.  *See* Sept. 21, 2018 Ltr. at 1. Truman wrote that both she and Samantha needed therapy as a result.  *See id.*  She then stated, "[y]ou have millions, I wonder how much I am worth being a sex slave in the end . . . what is [your wife] Nancy worth, I am at least worth half."  *Id.*  Truman's letter concluded:  "This is the last communication, I need to be free from this . . . I don't know what to say you should do, just find the right number for me.  Please help Samantha.  It is done now."  *Id.*

After Truman sent the two letters to Brown, they had two phone conversations. Compl. ¶ 73; *see also* Text Chain at 6. They discussed what Truman had spent on Samantha over the years and how much Brown should contribute. *See* Compl. ¶ 73. Truman stated, "we had a long, long relationship. But I gave you lots of pleasure, seriously. And you always used to tell me you were gonna help me, and I believed you. But every time, you never did anything." Call Trs. at 6. Brown agreed that this was his fault, and Truman responded: "Yes, yes. So now you need to make up for it." *Id.* She added: "I really think that in your mind, if you know that you did wrong to me that you need to make it up to me. And I know you can come up with the right number." *Id.* When Brown asked what the "right number" was, Truman said, "a lot . . . how much is Nancy worth? I'm worth at least half of that. How much is your daughter worth?" *Id.* at 6–7.

In these phone conversations, Brown agreed to pay Truman $500,000 by October 4, 2018, on the condition that she not tell his family he was Samantha's father. *See* Compl. ¶¶ 74–75. The call transcripts reveal that Brown said that Truman "[wouldn't] see" the money for "at least a week and a half." Call Trs. at 3 (JENNIFER: "So I'll be expecting, like you know, you should be coming with a nice amount for me. And I know you will. And uh, I'll expect to see something. . . ." PETER: "You won't see it for at least a week and a half . . . I will send you something."); *see also* Text Chain at 7 (Truman: "A week and a half like you said. I want to start the therapy soon. No more talking."). Brown said that he would send "at least a hundred grand." Call Trs. at 8. When Truman then suggested "five" as "a good number," Brown said, "[y]eah . . . it won't happen right away, though . . . [i]t will take a while." *Id.* When pressed by Truman, he said, "you'll get this first one, I promise you that." *Id.* at 9. After the call, Truman said, "at least he's gonna start with a hundred thousand." *Id.*

### 3. Brown Does Not Pay $500,000

On the morning of October 4, 2018, Truman sent Brown an email, which stated: "Good morning. It's the 4th. Like you told me on the phone, time for action . . . Please just try to do it all at once, the 470 like you said." Email Chain at 3–4. It appears that Brown then left Truman a voicemail, stating, "Uh, you threw us that number. I have no idea how I'm gonna raise it. But, I think we gotta discuss this a little bit, and how soon I can get more for you . . . And that we won't be con, contacting either of our, either of us, or you my family at all." Call Trs. at 11. In response, Truman emailed Brown saying, "Got your message . . . I didn't just make up this number, we discussed it the other night when you said you would have 100 by the 4th, today. Then we agreed on a final number of 500 during that conversation." Email Chain at 3; *see also* Compl. ¶ 76. Truman added: "I just want it to all be over and never communicate with you or your family ever again . . . I don't want to talk to you anymore." Email Chain at 3. Brown then emailed back, asking "[w]hat guarantees" he had that no one, including his family, would "ever be contacted about this again." *Id.* Brown then sent a second email, stating that he needed "to be assured that this will be the end of any and all contact," to which Truman responded, "[i]t will be." *Id.* at 2; *see also* Compl. ¶ 77. Brown never countered with a lower number. Compl. ¶ 77.

On the afternoon of October 4, 2018, Brown texted Truman, saying that he was "[a]waiting inward cable info for [c]hk today." Text Chain at 10. The next day, Brown texted that the money had "cleared." *Id.*; *see also* Compl. ¶ 77.

When Truman received the check, it was for $100,000, not "the agreed upon amount" of $500,000. Compl. ¶ 78; Demand Ltr. at 4. As a result, Truman hired an attorney, who sent a demand letter to Brown. Compl. ¶ 79; *see* Demand Ltr. The demand letter stated that Truman and Brown had entered "a binding and legal contract," under which Truman "promised not to contact [Brown] or [his] family or divulge the true nature of [their] relationship and the paternity

8

of her daughter in exchange for [Brown's] promise to pay her $500,000. [He] accepted that offer by agreeing to pay; therefore a contract was formed." Demand Ltr. at 3. The letter also stated that Brown would "reimburse her for the expenses of raising Samantha and the counseling she needs." *Id.* The letter instructed Brown to contact Truman's counsel by December 30, 2018 about paying the remaining $400,000, or Truman would take legal action. *Id.* at 4. Brown's counsel responded with a letter denying that Brown owed anything, because, he asserted, either there was no contract or the contract was unenforceable. Demand Reply at 1. In that letter, Brown's counsel accused Truman of extortion. *See id.* at 2–3; Compl. ¶ 80. Brown's counsel further stated that Brown was "looking forward to establishing a more involved relationship with Samantha." Demand Reply at 3.

Truman's Complaint alleges that Brown's conduct caused damage to Truman. *See* Compl. ¶¶ 80–84. This damage includes Truman's loss of her relationships with Ivan and Samantha; the years Truman lost while "raising the Defendant's daughter . . . which can never be recovered"; and the respect of those around her. *Id.* ¶¶ 81–83. The Complaint states that Truman is "now completely alone." *Id.* ¶ 84.

The Complaint further alleges that Brown's counsel's letter caused Truman more anxiety and distress, including by accusing her of extortion and stating that Brown now wanted to be involved in Samantha's life. *See id.* ¶¶ 80, 93–94. After Brown failed to pay the $500,000, Truman increased the amount of counseling she received. *Id.* ¶ 95. Truman's anxiety and emotional distress worsened in the months after receiving this letter, affecting her relationships and leading her to use Talkspace, a service that allows her to text professional therapists at any time and costs $500. *Id.* ¶¶ 96–97. Truman has also lost more than 25 pounds, which her physician has concluded is "100% stress related." *Id.* ¶ 98.

**B.      Procedural History**

On February 19, 2019, Truman filed her Complaint, Compl., accompanied by several exhibits, *see* Dkts. 1-4–1-10.  On April 2, 2019, Brown filed a motion to dismiss, Dkt. 10, which included a supporting memorandum of law, Dkt. 10-1 ("Def. Mem."), a declaration from Jonathan D. Warner, Esq., Dkt. 10-2, and an exhibit containing a copy of the now-sealed Complaint, Dkt. 10-3.  On April 3, 2019, the Court issued an order directing Truman to either amend her complaint or oppose the motion to dismiss.  Dkt. 11.  On April 15, 2019, Truman filed an opposition to Brown's motion.  Dkt. 15 ("Pl. Mem.").  On May 15, 2019, Brown filed his reply.  Dkt. 16 ("Def. Reply").

On May 17, 2019, Truman filed a motion requesting permission to file a sur-reply. Dkt. 17.  On May 20, 2019, the Court called for a response from Brown.  Dkt. 18.  On May 22, 2019, Brown filed that response, opposing Truman's request.  Dkts. 19.  The next day, the Court denied Truman's request.  Dkt. 20.[2]

---

[2] There have been a number of submissions and orders aimed at assuring that, given the sensitive matters discussed in various filings, that public filings were properly redacted.  On September 6, 2019, the Court issued a sealed order, and an accompanying publicly filed order, instructing counsel to publicly file redacted versions of the Complaint and Brown's memorandum of law in support of his motion to dismiss.  *See* Dkt. 21.  On September 10, 2019, Brown filed a redacted version of his memorandum of law.  Dkt. 22.  The same day, the Court issued a sealed order and a public order that directed Brown's counsel to file a redacted version of the exhibit in support of his motion to dismiss.  Dkt. 23.  On September 11, 2019, Truman filed a letter asking for clarification of the September 10, 2019 sealed order.  Dkt. 24.  That day, Brown filed a second redacted version of his memorandum of law, Dkt. 25, in addition to the Warner declaration, Dkt. 26, and a redacted version of the exhibit containing a copy of the Complaint, Dkt. 26-1. The Court also issued an order instructing Truman to file a redacted version of the Complaint. Dkt. 27.  Truman three times attempted to file redacted versions of the Complaint, but these attempts did not comply with the Court's instructions in its sealed orders.  *See* Dkts. 30, 32.  On September 16, 2019, Truman, now compliant, filed a redacted version of the Complaint. Dkt. 33.

## II.     Applicable Legal Principles

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch*, 699 F.3d at 145.  That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.     Discussion

Brown moves to dismiss each of Truman's three claims: for (1) breach of contract, (2) intentional infliction of emotional distress, and (3) negligent infliction of emotional distress. The Court addresses each in turn.

### A.     Breach of Contract

Brown moves to dismiss the breach of contract claim for three main reasons: because (1) it is an oral agreement barred by the Statute of Frauds, *see* Def. Mem. at 14–16; Def. Reply at 1–4; (2) it is the product of extortion and hence is void and unenforceable, *see* Def. Mem. at 9–13; Def. Reply at 4–7; and (3) to the extent Truman seeks to recover for a past sexual relationship, the agreement lacks consideration and is contrary to public policy, *see* Def. Mem. at 13–14.  The

Court addresses the first two arguments, finding that the first warrants dismissal and that the second, although presently a close question, does not.[3]

### 1. Statute of Frauds

The Statute of Frauds requires that if an agreement "[b]y its terms is not to be performed within one year from the making thereof" or if its performance "is not to be completed before the end of a lifetime," then, to be enforceable, that agreement must be in writing and "subscribed by the party to be charged." N.Y. Gen. Oblig. Law § 5-701(a)(1); *see also Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007). "[F]ull performance by all parties must be possible within a year to satisfy the Statute of Frauds." *Guilbert*, 480 F.3d at 151 (quoting *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 368 (1998)); *see also Sheehy v. Clifford Chance Rogers & Wells, LLP*, 3 N.Y.3d 554, 560 (2004).

The agreement alleged by Truman unavoidably falls within the Statute of Frauds because it is not capable of full performance by both parties within one year. Even assuming *arguendo* that the terms of the agreement were otherwise enforceable, Truman's Complaint alleges that, in consideration for money, Truman agreed to remain silent as to the nature of her relationship with Brown and as to Samantha's paternity. *See* Compl. ¶ 74; Demand Ltr. at 3. And, as alleged by

---

[3] In light of these rulings, the Court does not have occasion to reach Brown's third argument. The Court does note, however, that although compensation for illicit sexual relations cannot form the primary or main consideration for an agreement, *see, e.g.*, *Reid v. McLeary*, 706 N.Y.S.2d 179, 180 (2d Dep't 2000); *Pfeiff v. Kelly*, 623 N.Y.S.2d 965, 967 (3d Dep't 1995); *Rose v. Elias*, 576 N.Y.S.2d 257, 258 (1st Dep't 1991), New York courts will sever valid consideration where possible, *see e.g.*, *Donnell v. Stogel*, 560 N.Y.S.2d 200, 203 (2d Dep't 1990); *McCall v. Frampton*, 438 N.Y.S.2d 11, 13 (2d Dep't 1981). Here, Truman's Complaint identifies other types of alleged consideration for Brown apart from past sexual services. These include Truman's agreement to stay silent as to the true nature of the relationship with Brown, and to end contact with Brown's family. *See* Pl. Mem. at 9–10. Although past consideration cannot form the basis for a contract that is not in writing and signed by the party to be charged, *see Kastil v. Carro*, 536 N.Y.S.2d 63, 64 (1st Dep't 1988) (citing N.Y. Gen. Oblig. Law § 5-1105), Truman has identified potentially valid sources of present consideration.

Truman, there was no temporal sunset on Truman's confidentiality obligation—Truman's duty never to reveal these harmful facts was perpetual.

Confidentiality conditions such as this, which are intended to continue indefinitely, are barred by the Statute of Frauds if they are not in writing and signed by the party to be charged. *See, e.g.*, *Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 409–10 (S.D.N.Y. 2016) (condition that defendant news organization conceal plaintiff's identity was "by its (alleged) terms intended to apply in perpetuity" and fell within the Statute of Frauds); *Robins v. Zwirner*, 713 F. Supp. 2d 367, 375 (S.D.N.Y. 2010) (agreement that defendant not disclose sale of artwork was "intended to last for an unlimited duration" and fell within the Statute of Frauds (internal quotation marks omitted)).

To be sure, Brown's payment obligation to Truman could be completed within one year. But the Statute of Frauds applies where either side's performance obligation extends beyond one year, as is the case here with Truman's vow of silence. And while some cases have focused on whether the defendant's obligation is enduring, *see, e.g.*, *City of Yonkers v. Otis Elevator Co.*, 649 F. Supp. 716, 727 (S.D.N.Y. 1986); *Martocci v. Greater N.Y. Brewery*, 301 N.Y. 57, 62–63 (1950), the New York Court of Appeals has cautioned that "the nomenclature of the parties is not what is significant," *Messner Vetere Berger McNamee Schmetterer Euro RSCG v. Aegis Grp.*, 93 N.Y.2d 229, 237 (1999) ("*Messner*"). In a number of cases under New York law, the Statute of Frauds has been held to apply to agreements in which the plaintiff's obligations extended beyond one year. *See, e.g.*, *Bank of N.Y. v. Sasson*, 786 F. Supp. 349, 353 (S.D.N.Y. 1992); *Donaldson Acoustics Co. v. NAB Constr. Corp.*, 709 N.Y.S.2d 107, 107–08 (2d Dep't 2000); *Kastner v. Gover*, 244 N.Y.S.2d 275, 277 (1st Dep't 1963), *aff'd*, 14 N.Y.2d 821 (1964). The decisive question, in sum, is whether *both* parties can complete their performance in one year.

*See Sheehy*, 3 N.Y.3d at 560 ("In order to remove an agreement from the application of the statute of frauds, both parties must be able to complete their performance of the contract within one year."); *Tyler v. Windels*, 174 N.Y.S. 762, 763 (1st Dep't 1919) ("[N]othing short of full performance by both parties will take the contract out of the operation of the statute."). Here, they cannot.[4]

In light of this body of law, Truman therefore, properly, does not contend that her agreement with Brown, if not in writing and subscribed to by Brown, could survive under the Statute of Frauds. Instead, although not stating so explicitly, she implies that the agreement satisfies the Statute of Frauds. To this end, she makes two arguments: that Brown ratified the agreement through part performance; and that the documentation attached to her Complaint—including her letters to Brown, text message exchanges with Brown, email exchanges with Brown, and transcripts of her oral conversations with Brown—"clearly defines the contract's terms." Pl. Mem. at 10. These arguments, however, do not carry the day.

---

[4] It is no answer that Truman conceivably could die within one year. While death would prevent her from thereafter personally disclosing the pair's secrets, it would not prevent her Estate from doing so. The agreement here, as alleged, is not expressly terminable upon death. *Burke v. Bevona*, 866 F.2d 532, 536 (2d Cir. 1989) (contract made expressly terminable upon death may fall outside the Statute of Frauds). Truman's death would thus not constitute full performance. *See Cacchillo v. Insmed, Inc.*, 551 F. App'x 592, 594 (2d Cir. 2014); *see also Coudert v. Hokin*, No. 12 Civ. 0110 (ALC), 2017 WL 10221323, at *2 (S.D.N.Y. Aug. 23, 2017). It is also no answer that Truman could unilaterally claim to terminate the agreement within one year, for example, by repaying Brown and reasserting her right to disclose the pair's secrets. The agreement, as alleged, does not provide for a unilateral right to terminate, and a breach of the agreement does not constitute performance. *See Burke*, 866 F.2d at 538 ("The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute. The terms must be express."); *D&N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 456–57 (1984) ("[T]ermination is not performance, but rather destruction of the contract . . . where there is no provision authorizing either of the parties to terminate as a matter of right. . . . Indeed, the commentators have long agreed that the mere possibility of breach within the first year of an agreement does not constitute the possibility of some alternative performance which would take the agreement out of the Statute." (internal quotation marks and citations omitted)).

First, Brown's partial performance—making one $100,000 payment to Truman—cannot save the agreement under the Statute of Frauds. Although New York courts have held that part performance satisfies the Statute of Frauds as to contracts governed by General Obligations Law § 5-703, which applies to real estate contracts, they have not so held with respect to contracts governed by General Obligations Law § 5-701, which applies to agreements, like the one that Truman alleges existed here, that cannot be performed within one year. *See, e.g.*, *Messner*, 93 N.Y.2d at 234 n.1; *Stephen Pevner, Inc. v. Ensler*, 766 N.Y.S.2d 183, 184 (1st Dep't 2003); *Valentino v. Davis*, 703 N.Y.S.2d 609, 637–38 (3d Dep't 2000). Because the agreement posited by Truman falls under General Obligations Law § 5-701, the doctrine of part performance is inapplicable.

In any event, even assuming *arguendo* that the doctrine of part performance could apply to contracts incapable of performance within one year, it would not apply to the agreement pled here. Under that doctrine, "the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds," because the point of the part-performance doctrine is to protect the party who has substantially performed in reliance on the contract. *Messner*, 93 N.Y.2d at 237–38. Here, in contrast, Truman pleads that it is Brown, not she, who had partly performed, by giving her $100,000 of the $500,000 allegedly due. Truman, as the party insisting on enforcement of the contract, cannot invoke Brown's part performance as a basis to enforce the oral agreement

Second, the motley communications filed by Truman as attachments to her Complaint and as ostensibly embodying the parties' agreement—which consist of emails, text messages, phone call transcripts, and letters—do not satisfy the Statute of Frauds. To do so, the parties' agreement must have been evidenced by "some note or memorandum thereof . . . in writing, and

subscribed by the party to be charged therewith." N.Y. Gen. Oblig. § 5-701(a). Such a writing also "must contain substantially the whole agreement and all its material terms and conditions, so that one reading it can understand from it what the agreement is." *Kobre v. Instrument Sys. Corp.*, 387 N.Y.S.2d 617, 618–19 (1st Dep't 1976) (internal quotation marks and citation omitted).

Here—even assuming *arguendo* that the iterative sequence of written communications and transcripts of oral communications on which Truman relies could be reliably read to constitute an integrated agreement bearing definite terms—there is no such writing. Critically, the Complaint here, and its exhibits, do not reveal any document that is signed by Brown at all, as required by the Statute of Frauds. N.Y. Gen. Oblig. § 5-701(a). Instead, Brown's unsigned emails state only: "Sent from my iPhone."[5] *See* Email Chain at 2–3. And the assembled documentation on which Truman collectively relies as ostensibly satisfying the Statute of Frauds is infirm in other ways. For example, Truman relies on "oral evidence," *i.e.*, transcripts of the phone calls that she unilaterally recorded. These, however, do not constitute a writing within the meaning of the Statute of Frauds. *See Sonders v. Roosevelt*, 64 N.Y.2d 996, 997 (1985) (holding that plaintiff's tape recording of conversation with defendant did not satisfy Statute of Frauds).

Accordingly, Truman's breach of contract claim is barred by the Statute of Frauds.

### 2. Illegality

Brown argues that Truman's breach of contract claim is independently deficient because the agreement that Truman posits would be illegal. Illegal agreements "are, as a general rule,

---

[5] Although a typed signature at the end of an email may constitute a signed writing for purposes of the Statute of Frauds, *see Stevens v. Publicis, SA*, 854 N.Y.S.2d 690, 692 (1st Dep't 2008), Brown's emails do not contain such a signature. *See also Bayerische Landesbank v. 45 John St. LLC*, 960 N.Y.S.2d 64, 65 (1st Dep't 2013) (holding that email with pre-printed signature does not constitute signed writing).

unenforceable" in a breach of contract action. *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127 (1992). "It is the settled law of [New York] (and probably every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object." *State v. Freeman*, 298 N.Y. 268, 271 (1948).

Here, Brown argues that the agreement alleged by the Complaint is illegal because, on the facts pled, it is the product of extortion by Truman. *See* Def. Mem. at 11. Under New York law, a person commits extortion if she compels or induces another to transfer property to her by instilling in that person a fear that if the property is not delivered, the actor or someone working with her will "[e]xpose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule." N.Y. Penal Law § 155.05(2)(e)(v). Attempted extortion is also a crime. *See id.* § 110.00. In cases involving contracts found to be extortionate, New York courts have dismissed claims of breach, on the grounds that such contracts are illegal and unenforceable. *See Yao v. Bult*, 666 N.Y.S.2d 159, 160 (1st Dep't 1997).

Critically here, an element of extortion is a threat, from the person seeking the property, that she will expose the controversial secret or fact. *See People v. Dioguardi*, 8 N.Y.2d 260, 269 (1960); *see also* N.Y. Penal Law § 155.05(2)(e)(v). Such a threat can be implied, as opposed to explicit. *See Kraft Gen. Foods, Inc. v. Cattell*, 18 F. Supp. 2d 280, 285 (S.D.N.Y. 1998); *People v. Kacer*, 448 N.Y.S.2d 1002, 1007 (Sup. Ct., N.Y. County 1982).

The parties disagree about whether the Complaint and attached exhibits demonstrate that Truman threatened Brown, as required to find extortion. Brown argues that the Complaint and the accompanying Demand Letter support such a threat: In his framing, Truman demanded $500,000 from him, implying that she might otherwise disclose their longstanding affair and

Samantha's paternity. *See* Def. Mem. at 11; Def. Reply at 5 (citing Demand Ltr. at 3). As Brown notes, Truman, after Samantha learned about Brown's likely paternity, wrote: "You thought . . . no one would find out and there never would be consequences." Sept. 17, 2018 Ltr. at 1. Truman counters that, based on the Complaint and the documents attached to it, the condition that Truman remain silent was introduced by Brown, and that, viewing the pleadings in the light most favorable to Truman, she did not threaten, explicitly or implicitly, to disclose these damaging facts. *See* Pl. Mem. at 7–8.

The Court regards this question as close. Favoring Brown's reading, New York courts have held that agreements involving payments to induce a party to stay silent regarding sexual relationships and other intimate information bespeak extortion and are hence void for illegality. In *Yao*, for example, the plaintiff, a lawyer who had had an intimate relationship with a wealthy financial executive, threatened to expose that the executive was gay and that he had previously been in a relationship with an individual with AIDS. *See Matter of Yao*, 680 N.Y.S.2d 546, 547 (1st Dep't 1998) (per curiam); *Matter of Yao*, 661 N.Y.S.2d 199, 200 (1st Dep't 1997) (per curiam).[6] The plaintiff alleged that he and the executive had entered into an oral agreement in which the executive promised to pay the plaintiff $10,000 per month, in exchange for the plaintiff's promise not to publicize that personal information. *See Matter of Yao*, 680 N.Y.S.2d at 547; *Matter of Yao*, 661 N.Y.S.2d at 200. After making the first payment, the executive stopped paying, and the plaintiff sued for breach of contract. *Matter of Yao*, 661 N.Y.S.2d at

---

[6] While the First Department case that addressed the contract question, *Yao*, 666 N.Y.S.2d at 159, does not recount these facts, the two cited cases do so. These summarize the facts of the Yao dispute in the context of disciplinary hearings that resulted in plaintiff's temporary suspension from the Bar, *Matter of Yao*, 661 N.Y.S.2d at 202, and eventual disbarment, *Matter of Yao*, 680 N.Y.S.2d at 548, for extortion and filing the frivolous breach of contract claim.

200. The First Department affirmed the dismissal of the breach of contract claim, because the contract was extortionate.  *Yao*, 666 N.Y.S.2d at 160.

As Brown notes, the agreement alleged by Truman contains similar terms to that in *Yao*. In the Demand Letter sent to Brown's attorney, Truman's attorney described the agreement as follows:  "Ms. Truman promised not to contact [Brown] or [his] family or divulge the true nature of [their] relationship and the paternity of her daughter in exchange for [his] promise to pay her $500,000.  [He] accepted that offer by agreeing to pay; thereafter a valid contract was formed." Demand Ltr. at 3.  This statement is consistent with Truman's having—at least implicitly— threatened that, if she were not paid, she would expose her sexual relationship with Brown and Brown's out-of-wedlock paternity of Samantha, both of which constitute "secret[s]" that would tend to subject Brown to "hatred, contempt or ridicule."  N.Y. Penal Law § 155.05(2)(e)(v).

At the same time, Truman cites to allegations in the Complaint and attached exhibits that, although not establishing that Brown, unprompted, demanded Truman's silence as a condition on which he would pay her, are at least consistent with that series of events.[7]  On this reading, while the terms of Truman and Brown's agreement parallel those held void as extortionate in *Yao*, the non-disclosure condition was Brown's impetus exclusively.

In the end, the Court is mindful that on a motion to dismiss, the pleadings must be read in the light most favorable to the plaintiff.  A court must be wary of drawing factual inferences for a

---

[7] *See* Pl. Mem. at 8 (citing Compl. ¶ 74 (Brown "made it clear that he would give Ms. Truman money on the condition that she would forebear from disclosing the paternity of Samantha to his family")); *see also id.* at 8 n.1 (citing Call Trs. at 11 (Brown stating in voicemail that "I think we gotta discuss this a little bit . . . how to know that this is, will be the end of it.  And that we won't be con, contacted either of our, either of us, or you my family at all."); Email Chain at 2 (Brown stating in email that he "need[s] to be assured that this will be the end of any and all contact"); Email Chain at 3 (Brown asking in email, "What guarantees do I have that no family members or anyone Wil [sic] ever be contacted about this again?")).

defendant that, even if rational, are arguable. *See Edrei v. Maguire*, 892 F.3d 525, 539

(2d Cir. 2018) ("Perhaps this is an inference that a factfinder might ultimately make, but at this

stage we must draw all inferences in favor of the plaintiffs, not the defendants.").  Brown has not

cited case law under which an agreement to pay another not to publicize damaging secrets would

necessarily be extortionate and illegal where the facts show neither an express or implied threat

of disclosure by the person promising silence.  And the Court is unprepared, on the pleadings,

which leave less than pellucid the parties' full course of communications, to hold that Truman

necessarily threatened disclosure of Brown's embarrassing secrets so as to have committed

extortion.  The Complaint and the communications attached to it do not contain an express threat

by Truman to this effect.  And while these are consistent with an implied such threat, they do not

unambiguously reveal that Truman, in seeking money, implied that she otherwise might disclose

these secrets.

To be sure, Brown's claim that Truman implied such a threat, prompting his insistence on

such a condition, is quite plausible.  A finder of fact, upon hearing the principals' testimony and

reviewing the documentary evidence, including the Demand Letter, might well so conclude.  But

that reading—that Truman introduced the threat of disclosure—is not the only plausible one.

Truman's alternative theory is not inconceivable.  She posits that, after Samantha learned of

Brown's apparent paternity, Truman did no more than ask for money from Brown, and that it

was Brown who, newly fearful of disclosure now that there was no longer a secret to be kept

from Samantha, on his own initiative demanded a vow of silence from Truman as a condition for

paying her.  On that reading, Truman's acquiescence to that condition, without more, would not

constitute extortion on her part.  *See Andrea Doreen Ltd. v. Bldg. Material Local Union*, 299

F. Supp. 2d 129, 156 (E.D.N.Y. 2004) (no extortion because no threat); *cf. People v. Flynn*, 475

N.Y.S.2d 334, 338 (Sup. Ct., N.Y. County 1984) (larceny by trick and false pretenses charges, N.Y. Penal Law § 155.05(2)(a), not viable where evidence did not "rise to the level of even an implied threat").

Were Truman's breach of contract claim not blocked by the Statute of Frauds, the decisive question as to whether the contract was the product of extortion and hence inherently illegal—whether Truman expressly or impliedly threatened disclosure of Brown's secrets— would have been tested in discovery. Brown's claim that the agreement with Truman, if any, was the product of a threat of disclosure would then have been assessed on a full record of the parties' communications, and resolved, at summary judgment or at trial. However, because the breach of contract claim is independently deficient, there is no occasion to undertake such discovery.

The Court, accordingly, dismisses Truman's breach of contract, but only on the first ground urged by Brown: that the agreement Truman alleges is barred by the Statute of Frauds.

### B.    Intentional Infliction of Emotional Distress

The Court next addresses Truman's claim for intentional infliction of emotional distress ("IIED").

To plead a claim of IIED under New York law, a plaintiff must allege "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)); *accord Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). The New York Court of Appeals has held that these requirements, especially that of extreme and outrageous conduct, "are rigorous and difficult to satisfy." *Howell*, 81 N.Y.2d at 122; *see also Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303

(1983) (describing IIED as a "strict standard"). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Chanko v. Am. Broadcasting Cos.*, 27 N.Y.3d 46, 56 (2016) (quoting *Howell*, 81 N.Y.2d at 121).

Brown moves to dismiss Truman's IIED claim for two reasons. First, he argues that much of the actions alleged in the Complaint are time barred. *See* Def. Mem. at 16–18. Second, he argues that the Complaint does not allege extreme and outrageous conduct, and that Truman's conduct within the limitations period falls particularly short of that standard. *See id.* at 18–20; *see also* Def. Reply at 7–8.

### 1.   Statute of Limitations

IIED is subject to a one-year statute of limitations. *Gallagher v. Dirs. Guild of Am.*, 533 N.Y.S.2d 863, 864–65 (1st Dep't 1988) (citing CPLR § 215(3)); *see also Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F. Supp. 450, 455 (S.D.N.Y. 1997). Truman filed the Complaint on February 19, 2019. Brown notes that much of the conduct chronicled in the Complaint, which dates to the onset of Truman and Brown's affair in the mid-1980s, occurred before—often long before—February 19, 2018. Def. Mem. at 16. Most significantly, Brown argues that their sexual relationship, and Brown's allegedly manipulative conduct to induce Truman to engage in sex with him, cannot form the basis for the IIED claim because, as alleged in the Complaint, the pair's sexual relationship had ended prior to Truman's birthday in 2016, outside the limitations period. *See id.* at 17 (citing Compl. ¶ 90). Truman does not dispute this legal analysis. She states that it is Brown's actions "from the date that she informed him that his daughter discovered his paternity in September 2018" that constitute IIED, and that the

background facts of their longtime sexual relationship merely "provide context" for that claim. Pl. Mem. at 12.

Although addressed by neither party, some New York courts have applied the "continuing tort" doctrine when determining whether IIED claims are barred by the one-year statute of limitations. *See, e.g.*, *Shannon v. MTA Metro-N. R.R.*, 704 N.Y.S.2d 208, 209 (1st Dep't 2000); *Drury v. Tucker*, 621 N.Y.S.2d 822, 823 (4th Dep't 1994); *see also Neufeld v. Nuefeld*, 910 F. Supp. 977, 982 (S.D.N.Y. 1996) (describing conflict among New York courts whether continuing tort doctrine applies to IIED); *Bonner v. Guccione*, 916 F. Supp. 271, 275–77 (S.D.N.Y. 1996) (same). Under this doctrine, a plaintiff alleging a pattern of actionable conduct may rely on conduct falling outside the statute of limitations period for IIED, "so long as the final actionable event occurred within one year of the suit." *Shannon*, 704 N.Y.S.2d at 209; *see also Neufeld*, 910 F. Supp. at 983. Under this analysis, the continuing tort doctrine could enable Truman to rely on conduct prior to February 19, 2018 to establish her IIED claim, but only if conduct within the limitations period, examined on its own, is actionable as IIED. *See Robles v. Cox and Co.*, 841 F. Supp. 2d 615, 630–32 (E.D.N.Y. 2012).

The Court accordingly examines Brown's alleged conduct in the year before Truman filed the Complaint. Truman alleges the following: (1) Brown's failure to pay $500,000 in accordance with their alleged agreement, *see* Compl. ¶ 92; (2) Brown's accusation to Truman that their agreement was extortionate, *see id.* ¶ 93; and (3) Brown's counsel's statement, in the Demand Response letter, that Brown was "looking forward to establishing a more involved relationship with Samantha," *see id.* ¶ 94. *See* Pl. Mem. at 14–15. Truman argues that this conduct is "beyond all possible bounds of decency" because it "comes at the end of a 34-year

relationship that should have been resolved amicably" and "plays games" with her. *Id.* at 15 (citation omitted).

The Court holds, on this issue, with Brown. The above conduct, viewed separately and together, falls well short of the level of extreme and outrageous conduct required under New York law to establish IIED.

First, Brown's failure to pay Truman $500,000 under their agreement is not extreme and outrageous. As noted above, the agreement may be illegal and invalid, if the product of an implied or express threat of disclosure by Truman; if so, Brown's breach of it could not form the basis for an IIED claim. *See Valenza v. Emmelle Coutier, Inc.*, 733 N.Y.S.2d 167, 167 (1st Dep't 2001); *see also Pizzo v. Goor*, 857 N.Y.S.2d 526, 526–27 (1st Dep't 2008) (holding that contract that facilitated adultery was void on public policy grounds and thus could not support IIED claim). Regardless, Brown's breach is not extreme and outrageous, as "[a] breach of contract may sustain a cause of action for intentional infliction of emotional distress only in certain narrow circumstances." *Krause & Krause v. Gelman*, 562 N.Y.S.2d 42, 43 (1st Dep't 1990); *see also Wolkstein v. Morgenstern*, 713 N.Y.S.2d 171, 172 (1st Dep't 2000) ("Generally, a cause of action for infliction of emotional distress is not allowed if essentially duplicative of tort or contract causes of action."); *Hoheb v. Pathology Assocs. of Albany, P.C.*, 536 N.Y.S.2d 894, 896 (3d Dep't 1989) ("Generally, emotional damages are not compensable in a breach of contract action."); *Martin v. Donald Park Acres at Hasting, Inc.*, 389 N.Y.S.2d 31, 32 (2d Dep't 1976) (bad faith and deliberate breach not enough to stray from "general rule" that emotional distress is not compensable in breach of contract action). Courts considering IIED claims premised on failures to make payments under a contract or failures to assist an individual

in financial distress have dismissed such claims.[8]  Similarly here, Brown's failure to fulfill his

payment obligation under this agreement is not the kind of conduct that surpasses the bounds of

decency, as required in IIED claims.

Second, Brown's accusation of extortion by Truman does not qualify as extreme and

outrageous conduct.  *See* Compl. ¶ 93.  Even assuming this accusation was false, false

accusations of criminal conduct, or conduct that society deems reprehensible, do not inherently

establish IIED.  *See, e.g.*, *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 374–75 (S.D.N.Y.

2016) (dismissing IIED claim against university for its treatment of plaintiff accused of rape,

explaining that "even a false charge of sexual harassment does not rise to the level of outrage

required" (citation omitted)); *Wolff v. City of N.Y. Fin. Servs. Agency*, 939 F. Supp. 258, 264

(S.D.N.Y. 1996) (dismissing IIED claim where defendant falsely accused plaintiff of sexual

harassment); *Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141, 157–58 (S.D.N.Y. 1995)

(dismissing IIED claim where defendant falsely accused plaintiff of stealing to pay credit card

debt); *Herlihy v. Metro. Museum of Art*, 633 N.Y.S.2d 106, 114 (1st Dep't 1995) (dismissing

IIED claim where plaintiff alleged that defendant falsely accused her of using ethnic slurs).

Further, even cases involving false accusations that actually have been reported to authorities "do

---

[8] *See, e.g.*, *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 122–23 (S.D.N.Y. 2002)
(dismissing IIED claim where defendant terminated plaintiff's disability benefits and framing
the case as a "true contract case[] recast in tort"); *MaGee v. Paul Revere Life Ins. Co.*, 954 F. Supp.
582, 587 (E.D.N.Y. 1997) (dismissing IIED claim where defendant terminated insurance
benefits, explaining that the case "at its core, [was] one for breach of contract based on failure to
pay insurance benefits with an extra twist" concerning defendant's investigative practices);
*Barnum v. Milbrook Care Ltd.*, 850 F. Supp. 1227, 1238–39 (S.D.N.Y. 1994) (dismissing IIED
claim where defendant failed to pay entire obligation under note); *Garner v. William Iselin &
Co.*, 529 N.Y.S.2d 772, 774 (1st Dep't 1988) (dismissing IIED claim where defendant refused to
provide additional credit to plaintiff company in "financial trouble"); *O'Rourke v. Pawling Sav.
Bank*, 444 N.Y.S.2d 471, 472 (2d Dep't 1981) (dismissing IIED claim where defendant forced
usurious loan on plaintiffs, knowing that plaintiffs "were distressed").

not suffice for an IIED claim absent additional outrageous behavior." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 224 (E.D.N.Y. 2010) (internal quotation marks and citation omitted); *see also Hill v. City of New York*, No. 05 Civ. 9473 (RMB) (JCF), 2006 WL 2347739, at *5 (S.D.N.Y. Aug. 14, 2006) (collecting cases). The Second Circuit has suggested that sufficient additional outrageous behavior could be "some combination" of alleged "public humiliation, . . . verbal abuse or harassment, physical threats, permanent loss of employment, or conduct contrary to public policy" with false accusations of criminal conduct. *Stuto*, 164 F.3d at 828–29 (collecting cases). But Truman's Complaint, aside from generally alleging that she "has lost the respect of everyone she knows," Compl. ¶ 83, does not allege any such circumstances within the limitations period.

More generally, Brown's statement, through counsel, that Truman's conduct was extortionate was not at all outrageous. Truman does not allege that Brown pursued or threatened a criminal prosecution, but merely that Brown's counsel so characterized her conduct in a private writing. *See, e.g.*, *Kurschus v. PaineWebber, Inc.*, 16 F. Supp. 2d 386, 395 (S.D.N.Y. 1998); *Kaminski v. United Parcel Serv.*, 501 N.Y.S.2d 871, 872–73 (1st Dep't 1986). This statement—which essentially articulated a non-frivolous legal defense in response to Truman's demand for compliance with an alleged agreement—falls far short of exceeding the bounds of decency.

Third, counsel's statement that Brown was "looking forward to establishing a more involved relationship with Samantha" is also not actionable. Truman depicts this statement as an attempt by Brown to "play games" with her after the end of their 34-year relationship. Pl. Mem. at 15. The Court assumes *arguendo* that, as Truman's pleadings imply, Brown did not have an authentic intention to develop a relationship with his apparent biological daughter, then an adult.

Even if so, his statement of his intention to do so was not extreme or outrageous, measured against the high standards set by the case law.

For the above the reasons, and having considered Brown's alleged conduct within one year of the Complaint's filing as a whole, the Court finds that it was not sufficiently extreme to qualify as IIED. As such, the continuing tort doctrine does not apply, and Brown's earlier conduct toward Truman, is not properly considered. The Court therefore dismisses the Complaint's IIED claim for failure to state a claim.

### 2. Extreme and Outrageous Conduct

Brown independently argues that, even if the full range of his conduct toward Truman dating back to 1985 were properly considered, it would not qualify as extreme and outrageous conduct, as necessary to establish IIED. *See* Def. Mem. 18–20. Although Brown's historical conduct toward Truman presents a substantially closer question than his conduct following February 19, 2018, Brown is ultimately correct on this point, too.

The Complaint provides extensive detail about Truman's relationship with Brown, dating back to 1985. *See* Compl. ¶ 12. In short, the Complaint alleges that the two had a consensual, decades-long affair. *See id.* ¶ 22. New York courts, however, have found that consensual affairs among adults do not inherently constitute extreme or outrageous conduct. *See, e.g.*, *Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 392–93 (4th Dep't 2004) (no extreme and outrageous conduct where pastor had affair with plaintiff while providing counseling to plaintiff and spouse); *Vione v. Tewell*, 820 N.Y.S.2d 682, 687–88 (Sup. Ct., N.Y. County 2013) (same); *see also Rodrigues-Lytwyn v. Roman Catholic Diocese of Brooklyn*, 912 N.Y.S.2d 411, 411–12 (2d Dep't 2010) (mem.) ("[A] cause of action cannot be maintained for a voluntary sexual affair between consenting adults.").

To be sure, Truman's Complaint alleges much deeply distasteful conduct on Brown's part in the course of the longtime affair. For example, it alleges that when Truman sought a loan from Brown, he replied that, "if you cannot get the money anywhere else, you will have to pay me back with your body." Compl. ¶ 91. But New York courts—while recognizing that sexual harassment may, on rare occasions, constitute a basis for IIED, *see Chau v. Donovan*, 357 F. Supp. 3d 276, 287 (S.D.N.Y. 2019)—have found "crude and offensive statements of a sexually derisive nature" not to rise to the level of extreme and outrageous. *Shea v. Cornell Univ.*, 596 N.Y.S.2d 502, 504 (3d Dep't 1993); *see also Ponticelli v. Zurich Am. Ins. Grp.*, 16 F. Supp. 2d 414, 440–41 (S.D.N.Y. 1998). Similarly, the Complaint alleges that Brown treated Truman as his "sexual possession" and "sexual 'play thing.'" Compl. ¶ 88. But Truman does not anywhere allege that her participation in sex with Brown was ever non-consensual. That distinguishes cases involving sexual conduct where IIED claims have been held actionable. *See, e.g.*, *Chau*, 357 F. Supp. 3d 276 at 287–88 (alleging "unwanted bodily contact" from defendant, including "groping, kissing, very painful digital penetration, and touching . . . inappropriately despite being told to stop" (internal quotation marks omitted)); *Offei v. Omar*, No. 11 Civ. 4283 (SAS) (MHD), 2012 WL 2086294, at *4 (S.D.N.Y. May 18, 2012), *report and recommendation adopted*, 2012 WL 2086356 (S.D.N.Y. June 8, 2012) (defendant pled guilty to sexual assault in criminal proceeding); *cf. Leviston v. Jackson*, 980 N.Y.S.2d 716, 722–23 (Sup. Ct., N.Y. County 2013) (alleging that defendant, without permission, published sex tape of plaintiff).

Of the reported cases, *Marmelstein v. Kehillat New Hempstead*, 11 N.Y.3d 15 (2008), provides perhaps the closest analog to this. There, the plaintiff sued her rabbi, with whom she "acknowledges that she acquiesced and began a sexual relationship," for IIED. *Id.* at 18. The

plaintiff alleged that she had contacted him to discuss "various personal issues," and he took advantage of her vulnerabilities, including her desire to have a husband. *Id.* The complaint stated that the rabbi told the plaintiff that she was "his 'favorite' and 'closest,' and that he 'would be there for all her needs.'" *Id.* (internal quotation marks and citation omitted). He allegedly characterized their relationship as "sexual therapy," which was to help plaintiff find a husband, *id.*; but she alleged that he abused her for his own sexual pleasure and gratification, *Marmelstein v. Kehillat New Hempstead*, 841 N.Y.S.2d 493, 495 (1st Dep't 2007). The rabbi threatened her to keep quiet about the relationship, and after their relationship ended four years later, the rabbi tarnished her reputation and she had to leave the synagogue. *See Marmelstein*, 11 N.Y.3d at 18–19. The New York Court of Appeals nevertheless affirmed the dismissal of the IIED claim, holding that the alleged conduct was not extreme and outrageous. *See id.* at 22–23.

This case has considerable parallels to *Marmelstein*. As there, the Complaint alleges that Truman was vulnerable when she met Brown—she was 21 years old, lacked a father figure, and had endured an abusive childhood—and that Brown was aware of these vulnerabilities. *See* Compl. ¶¶ 12, 19–21. The Complaint alleges that Brown made Truman "believe that he cared for her and that she was special to him," *id.* ¶ 23; that she was part of his family, *see id.* ¶¶ 51–52; and that he "would be there for her" if she ever needed anything, *id.* ¶ 50. The Complaint alleges that Truman believed that a sexual relationship with Brown would allow her to keep her job, *id.* ¶ 23; and suggests that their sexual relationship primarily was at Brown's behest, *see id.* ¶ 88 (Brown manipulated Truman into his "sexual possession" and "sexual 'play thing'"); *see also* Sept. 17, 2018 Ltr. ("Now that the truth is out—don't you think it is your turn to step up and return the favor to me for all the pleasure/escape I gave you in life."); Sept. 21, 2018 Ltr. ("I wonder how much I am worth being a sex slave in the end."). The Complaint further alleges that

Truman agreed to stay silent about their relationship and Samantha's paternity, and to cut off contact with Brown's family.  Compl. ¶¶ 74, 77.  After the relationship ended and Samantha's paternity was made public, the Complaint alleges, Truman's relationship with her daughter and boyfriend deteriorated, leaving her to feel "completely alone."  *Id.* ¶¶ 81, 84.  Brown's tawdry conduct is thus on a par with that in *Marmelstein*.  But it is not materially more extreme or outrageous.  As such, given the *Marmelstein* precedent, Truman's Complaint—even treating as cognizable all allegations dating back to 1985—fails to allege sufficiently extreme and outrageous conduct to make out a claim of IIED.

The Court accordingly holds that the Complaint has failed to state a claim for IIED.

### C.      Negligent Infliction of Emotional Distress

The Court finally turns to Truman's claim of negligent infliction of emotional distress ("NIED").  It, too, fails to state a claim.

Under New York law, a plaintiff alleging NIED must show "(1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress."  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 297 (S.D.N.Y. 2015) (citation omitted).  As to the first element, New York courts use the same standard in evaluating extreme and outrageous conduct in both IIED and NIED claims.  *See Dillon v. City of New York*, 704 N.Y.S.2d 1, 7 (1st Dep't 1999); *see also Acquista v. N.Y. Life Ins. Co.*, 730 N.Y.S.2d 272, 279 (1st Dep't 2001).  Hence, as for IIED, a plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Goldstein v. Mass. Mut. Life Ins. Co.*, 875 N.Y.S.2d 53, 55 (1st Dep't 2009) (quoting *Howell*, 81 N.Y.2d at 122).

The conduct on Brown's part that forms the basis of Truman's NIED claim is the same as formed the basis for her IIED claim.  As such, for the same reasons that Brown's claim of IIED

failed to allege extreme and outrageous conduct, her claim of NIED similarly fails. *See Vail v. City of New York*, No. 18 Civ. 9169 (JPO), 2020 WL 127639, at *4 (S.D.N.Y. Jan 10, 2020). Accordingly, the Complaint fails to state a claim for NIED.

Truman's NIED claim is deficient for a second reason. Under the case law, there are limited recognized contexts in which a claim of NIED may be viable. A plaintiff must plead, in addition to the elements above, facts making out one of three "theories": (1) a bystander theory, (2) a direct duty theory, or (3) a special circumstances theory. *See Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000). Truman's Complaint pleads none.

Under the bystander theory, a plaintiff must allege that "(1) she [was] threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffer[ed] emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996); *see also Baker*, 239 F.3d at 421. The bystander theory has no application here, where Truman's Complaint does not allege the death of or serious bodily injury to one of Truman's family members. *See Carney v. Bos. Mkt.*, No. 18 Civ. 713 (LGS), 2018 WL 6698444, at *4 (S.D.N.Y. Dec. 20, 2018).

Under the direct duty theory, a plaintiff must allege that "she suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." *Mortise*, 102 F.3d at 696. This duty "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Id.* The direct duty theory also requires "an objective inquiry turning on whether a plaintiff's physical safety was actually endangered, not a subjective evaluation dependent on the plaintiff's state of mind." *Carney*, 2018 WL 6698444, at *3. Truman's Complaint, however, does not allege that Brown had a specific duty to Truman, or that

he unreasonably endangered her physical safety.  *See Baker*, 239 F.3d at 421; *Chau*, 357

F. Supp. 3d at 289.

Finally, New York law recognizes specific "special circumstances" cases for NIED

where there is "an especial likelihood of genuine and serious mental distress, arising from . . .

special circumstances, which serves as a guarantee that the claim is not spurious."  *Baker*,

239 F.3d at 421 (quoting *Johnson v. State*, 37 N.Y.2d 378, 382 (1975)); *see also Colo. Capital

Inves., Inc. v. Owens*, 304 F. App'x 906, 908 (2d Cir. 2008).  Examples include a hospital

negligently informing an individual that her parent had died, *see Johnson*, 37 N.Y.2d at 383; a

negligent misdiagnosis of HIV, *Baker*, 239 F.3d at 422; and the mishandling of a loved one's

remains, *see Lando v. State of New York*, 39 N.Y.2d 803, 804–05 (1976); *Jones v. City of New

York*, 915 N.Y.S.2d 73, 74 (1st Dep't 2011).  Truman's Complaint, alleging exploitative conduct

in the context of a longstanding extramarital affair, falls outside the limited contexts in which

"special circumstances" have been recognized.  *See Carney*, 2018 WL 6698444, at *4.

The Court therefore dismisses the NIED claim.

### D.     Leave to Amend

Truman requests leave to amend any deficient portions of the Complaint.  Pl. Mem. at 16.

Federal Rule of Civil Procedure 15(a) instructs that courts "should freely give leave [to amend a

complaint] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "When a claim is dismissed

because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend [her]

complaint."  *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 254 (S.D.N.Y. 2004).

 However, "[a] district court has discretion to deny leave for good reason, including

futility, bad faith, undue delay, or undue prejudice to the opposing party."  *McCarthy v. Dun &

Bradst. Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Here, there is good cause to deny leave to

amend.  Truman has already had an opportunity to amend to cure the defects in her Complaint as

identified by Brown.  On April 3, 2019, after the filing of Brown's motion to dismiss, the Court instructed Truman to file any amended complaint by April 24, 2019, and notified her that "[n]o further opportunities to amend will ordinarily be granted."  Dkt. 11 at 1; *see F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017) (affirming denial of leave to amend and acknowledging district court's individual rules that employed similar language); *Ritchie Capital Mgmt., LLC v. Gen. Elec. Capital Corp.*, 821 F.3d 349, 351–52 (2d Cir. 2016) (per curiam) (same).  Truman elected not to amend the Complaint.  Instead, she opposed Brown's motion to dismiss.

Separately, Truman has made only a conclusory request for leave to amend—in her opposition to Brown's motion to dismiss, she seeks, in a sentence, "leave to amend those deficient portions of her Complaint."  Pl. Mem. at 16.  Despite being on notice of the deficiencies claimed by Brown, Truman has not identified any proposed amendments for the Court to evaluate that might cure the deficiencies afflicting each of her claims.  This, too, supports denial of leave to amend, on futility grounds.  *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"); *see also F5 Capital*, 856 F.3d at 89 (affirming denial of leave to amend on futility grounds where plaintiff provided "no clue as to how the complaint's defects would be cured through an amendment" (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the Court grants Brown's motion to dismiss, and dismisses the Complaint, with prejudice.  The Clerk of Court is respectfully instructed to terminate the motion pending at docket 10 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 21, 2020
New York, New York